IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| PMC CASUALTY CORP., | ) |
| Plaintiff, | ) ) ) |
| vs. | ) ) Case No. 24 C 7795 |
| VIRGINIA SURETY CO., INC., | ) ) ) |
| Defendant. | ) |

### MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

This case, which was transferred here from the Middle District of Florida, involves a reinsurance contract. Two companies, named Protect My Car, LLC and Protect My Car Admin Services, Inc. (collectively "Protect My Car"), sold vehicle service contracts—a form of extended warranty—to owners of motor vehicles. Protect My Car obtained liability insurance—called contractual liability insurance policies (CLIPs)—from defendant Virginia Surety to insure its obligations under the service contracts. Virginia Surety, after issuing the CLIPs, obtained insurance from plaintiff PMC Casualty to protect it against the risks it assumed under the CLIPs.[1]

The relationship between PMC and Virginia Surety is governed by a written contract called a Reinsurance Agreement. Under the agreement, Virginia surety "ceded," and PMC reinsured, 100 percent of the risk of any payments that might have to

---

[1] It is apparently no coincidence that an acronym for Protect My Car would be PMC, the same as PMC Casualty: PMC Casualty is apparently a captive insurer of Protect My Car.

be made under the vehicle service contracts covered by the CLIPs. This includes the return of refunds due to the vehicle owners if they cancelled the vehicle service contract mid-term.

Under the Reinsurance Agreement, PMC is required to maintain a trust agreement or a letter of credit to secure its obligations to Virginia Surety. PMC and Virginia Surety agreed that Virginia Surety could withdraw assets in the trust account only for four enumerated purposes: to reimburse Virginia Surety for PMC's share of premiums refunded for cancelled service contracts; to reimburse Virginia Surety for PMC's share of benefits and losses paid by Virginia Surety under the service contracts; to fund an account to cover reserves for claims and losses incurred; and "to pay any other amounts [Virginia Surety] claim[s] are due under this Agreement." Compl. ¶ 18 (quoting Compl., Ex. 1 § A-11(e)).

The agreement further provides that after the end of each calendar quarter, Virginia Surety must provide PMC a report concerning reserves. The agreement sets out a method of calculating the account between Virginia Surety and PMC. It provides that if the net result is positive, that amount is due from PMC to Virginia Surety, and that if it is negative, that amount is due from Virginia Surety to PMC.

In April 2023, the parties amended the Reinsurance Agreement to provide for transfer of the amounts held in the trust account to a "Funds Withheld Account" held by Virginia Surety. Virginia Surety's ability to withdraw amounts from was restricted in same way it had been with respect to the trust account.

According to PMC, a report issued by Virginia Surety "as of" January 31, 2024 stated that there were cancellation refund amounts of over $18 million due to PMC.

PMC alleges that it asked for payment of the amounts due, but Virginia Surety declined to pay, citing potential liabilities in a separate lawsuit filed in state court by an entity called PayLink Payment Plans, LLC, and contending it (Virginia Surety) is entitled to withhold payment to cover these potential liabilities.

PMC's complaint references the PayLink-vs.-Virginia Surety lawsuit, and Virginia Surety has attached PayLink's complaint to its motion to dismiss. The contentions in that lawsuit are therefore properly considered, so the Court takes a brief detour to do so. PayLink is not a party to the Virginia Surety—PMC Reinsurance Agreement; rather, it has a business relationship with Protect My Car, LLC. Under the PayLink—Protect My Car contract, PayLink provides an advance to Protect My Car that amounts to a percentage of the installment payments due from vehicle owners over the life of their vehicle service contracts. In return, Protect My Car agrees to remit to PayLink the instalment payments as they are received, until PayLink has collected the amount it advanced, plus a fee. PayLink's complaint notes that under Illinois law, Protect My Car is required to refund certain amounts to the contract holder upon cancellation, and must obtain liability insurance to guarantee payment of these amounts to canceling contract holders—thus Protect My Car's insurance agreement with Virginia Surety.

PayLink alleges that it financed about 39,000 vehicle service contracts for Protect My Car from 2021 through 2023. Nearly 30,000 of those contracts were cancelled before PayLink was able to recoup its advances and fees. Under the vehicle owners' service contracts, PayLink alleges, they assigned to PayLink their rights to cancellation refund payments. But according to PayLink, Protect My Car has refused to pay PayLink what it is due on the cancelled contracts. Protect My Car further alleges that Virginia

Surety is on the hook for these payments via its insurance agreement with Protect My Car, but Virginia Surety likewise has refused to pay PayLink. In its state court lawsuit, PayLink has sued only Virginia Surety, and not Protect My Car—presumably because Protect My Car has gone belly-up or is otherwise unable to satisfy a judgment.

As indicated earlier, Virginia Surety says that it is withholding payment to PMC of the supposed excess funds in the funds withheld account to cover its (Virginia Surety's) potential liabilities in the PayLink lawsuit. PMC says that Virginia Surety is not entitled to withhold payment on this basis; in this lawsuit, it asserts a claim for breach of contract. (PMC also alleges that Virginia Surety has breached in various other ways, but the key issue, at least from a dollar standpoint, involves the withholding of payment based on Virginia Surety's potential liabilities in the PayLink lawsuit.)

The parties' dispute largely boils down to a disagreement over the meaning of a particular term in the reinsurance agreement. Specifically, section A-10(a), which sets out how any amounts to be remitted to one party or the other from the funds withheld account are to be determined, allows a deduction for "any other amount relevant to the [Reinsurance] Agreement." Compl., Ex. 1 § A-10(a)(5). Oversimplifying things somewhat, Virginia Surety says that the potential that it may be held liable to PayLink in state court for what amounts to the same (or some of the same) sums that PMC wants from Virginia Surety makes those potential state court liability "relevant to the [Reinsurance] Agreement." PMC, by contrast, says that the reinsurance agreement is not appropriately read to give Virginia Surety discretion, on its own, to withhold payment on this basis.

The contractual term "amount(s) relevant to the Agreement" is arguably facially

4

ambiguous, and it is not defined in the reinsurance agreement. *See generally Lexington Ins. Co. v. RLI Ins. Co.*, 949 F.3d 1015, 1020 (7th Cir. 2020) (contractual language may be ambiguous if it is "obscure in meaning through indefiniteness of expression" (citation omitted)). Its interpretation at least arguably may entail consideration of extrinsic evidence and thus may involve questions of fact. *See id.* ("Illinois courts do not hesitate to order consideration of extrinsic evidence if contract language alone cannot resolve a dispute."). The Court concludes that the merits of this dispute may not appropriately be determined on a motion to dismiss for failure to state a claim.

One other argument made by Virginia Surety lacks merit, at least on the present record. Virginia Surety argues that PMC does not have a valid certificate of authority from the state of Delaware and thus is entitled to nothing, under a contractual term that says Virginia has no obligation to pay PMC for or during any period of time when PMC lacks such a certificate. Compl., Ex. 1 § A-10(c). In Delaware, a "captive" insurance company may do reinsurance business only if it maintains its principal place of business in that state. 18 Del. Code § 6903(b)(3). But in PMC's complaint in the present case, it alleged that its principal place of business is in Florida. Compl. ¶ 3. Thus, Virginia Surety says, PMC cannot properly do business under its Delaware certificate of authority. In its response, PMC says that Delaware law deems a captive insurer's principal place of business to refer to whether the entity has a registered office in Delaware, *see* 8 Del. Code § 131, which is a different definition from the one used in determining diversity jurisdiction under 28 U.S.C. § 1332. The Court concludes that Virginia Surety is not entitled to dismissal on this basis.

**Conclusion**

For the reasons stated above, the Court denies defendant's motion to dismiss [dkt. no. 14]. The parties (including Protect My Car, LLC, against which Virginia Surety has filed a third party complaint) have separately moved to stay proceedings for thirty days to permit them to try to resolve the case by agreement. The Court grants the motion to stay [dkt. no. 57] and stays the case through February 3, 2025. A joint status report is to be filed on February 4, 2025. A telephonic status hearing is set for February 11, 2025 at 9:05 a.m., using call-in number 650-479-3207, access code 2305-915-8729. The telephonic status hearing set for January 23, 2025 is vacated.

Date: December 30, 2024

_____
MATTHEW F. KENNELLY
United States District Judge