IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| PMC CASUALTY CORP., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 24 C 7795 |
| ) | |
| VIRGINIA SURETY CO., INC., ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

PMC Casualty Corp. sued Virginia Surety Co., Inc. for breach of a reinsurance agreement. It alleged that Virginia Surety failed to pay certain reserves—an over $18 million "Cancellation Refunds" amount and an over $1.8 million "Open Claims" amount—owed to PMC Casualty. Virginia Surety moved to dismiss the complaint, arguing that it had the right under the reinsurance agreement to withhold these funds.

The case, originally filed in the Middle District of Florida, was transferred to the Northern District of Illinois and reassigned to the undersigned judge. This Court denied Virginia Surety's motion to dismiss, concluding that a provision in the reinsurance agreement allowing Virginia Surety to deduct "any other amount relevant to the Agreement" from what it owed to PMC Casualty was too ambiguous to justify dismissal of the complaint for failure to state a claim.

Virginia Surety has filed a motion to reconsider the denial of its motion to dismiss. It argues that the Court did not consider its arguments concerning other provisions in the reinsurance agreement that it contends allow it to withhold funds. The Court agrees

that it did not consider these arguments in its initial ruling. But upon considering these arguments, the Court finds the additional reinsurance agreement provisions cited by Virginia Surety to be too ambiguous to justify dismissal and concludes that PMC Casualty has plausibly alleged its claims. The Court therefore grants Virginia Surety's motion for reconsideration but denies its motion to dismiss.

**Background**

At the motion to dismiss stage, the Court accepts as true all well-pleaded factual allegations. *Ashcroft v. al-Kidd*, 563 U.S. 731, 734 (2011). Protect My Car, LLC and Protect My Car Admin Services, Inc. (collectively "Protect My Car") sold vehicle service contracts, a form of extended warranties, to owners of motor vehicles. Protect My Car obtained liability insurance—called contractual liability insurance policies (CLIPs)—from defendant Virginia Surety to insure its obligations under the service contracts. Virginia Surety then obtained insurance from PMC Casualty to protect it against the risks it assumed under the CLIPs.

The relationship between PMC Casualty and Virginia Surety is governed by a written contract called a reinsurance agreement. Under the agreement, Virginia Surety ceded, and PMC Casualty reinsured, 100% of the risk of any payments that might have to be made under the vehicle service contracts covered by the CLIPs. In exchange, PMC Casualty receives any net positive reserves created by the service contracts, including any surplus premiums Virginia Surety received as a result of a service contract being cancelled mid-term.

The reinsurance agreement required PMC Casualty to maintain a trust account or a letter of credit to secure its obligations to Virginia Surety. PMC Casualty and

Virginia Surety agreed that Virginia Surety could withdraw assets from the trust account only for four enumerated purposes: (1) to reimburse Virginia Surety for PMC Casualty's "share of premiums refunded pursuant to the provisions of the Reinsured Policies on account of cancellations of those Reinsured Policies," (2) to reimburse Virginia Surety for PMC Casualty's "share of surrenders" and benefits or losses paid by Virginia Surety "pursuant to the terms and provisions of the Reinsured Policies," (3) to fund an account to cover reserves for claims and losses incurred; and (4) "to pay any other amounts [Virginia Surety] claims are due under this [a]greement." PMC Casualty's Compl., Ex. 1 § A-11(e).

The agreement also set out a method for calculating the account between PMC Casualty and Virginia Surety to determine ownership of any net reserves. If the amount calculated resulted in net positive reserves, the net was due to PMC Casualty from Virginia Surety. But if the net was negative, the net was due to Virginia Surety from PMC Casualty.

In April 2023, PMC Casualty and Virginia Surety agreed to amend the reinsurance agreement. The amendment transferred the funds previously held in PMC Casualty's trust account to a Funds Withheld Account to be held by Virginia Surety. The amendment did not, however, change the limitations upon Virginia Surety for withdrawing assets from the account.

One last relevant requirement of the reinsurance agreement is that it required Virginia Surety to provide quarterly reports concerning the reserves in the account. According to PMC Casualty, two reports issued by Virginia Surety—a "Q4 2023" report and an "'as of' January 31, 2024" report—acknowledged reserves due to PMC

3

Casualty. PMC Casualty's Compl. ¶¶ 29–30. These reports indicated that over $18 million of "cancellations" and over $1.8 million of "claims" were due to PMC Casualty. *Id.*

PMC Casualty alleges that it asked for payment of these "Cancellation Refunds" and "Open Claims" amounts, but Virginia Surety declined to pay, citing potential liabilities in a separate lawsuit filed in state court by PayLink Payment Plans, LLC. PMC Casualty's complaint references this PayLink lawsuit, and Virginia Surety has attached PayLink's complaint to its motion to dismiss, so the Court may consider the contentions made in that lawsuit. *See Reed v. Palmer*, 906 F.3d 540, 548 (7th Cir. 2018); *see also Black Bear Sports Grp. v. Amateur Hockey Ass'n of Ill., inc.*, No. 18 C 8364, 2019 WL 2060934, at *3 (N.D. Ill. May 9, 2019) (Kennelly, J.) ("[W]here . . . significant documents are referenced in the complaint and attached by the defendant to its motion to dismiss, those documents are considered to be incorporated into the pleadings and a court may consider them.") (collecting cases).

In the PayLink action, PayLink alleges that Virginia Surety owes it roughly $20 million in vehicle service contract cancellation refunds. Although PayLink is not a party to the reinsurance contract between Virginia Surety and PMC Casualty, PayLink contends it has a right to refunds as a financier of the underlying vehicle service contracts sold by Protect My Car. PayLink financed vehicle service contracts by agreeing to advance Protect My Car a percentage of the sales price that it charged the vehicle owners. In exchange, Protect My Car would pay PayLink the installment payments due from vehicle owners until PayLink collected the amount it advanced, plus a fee.

PayLink alleges that about 30,000 of the contracts it financed were cancelled by vehicle service owners before it was able to recoup its advances and fees from Protect My Car. PayLink sued Virginia Surety for compensation, alleging that it is owed refund amounts mandated by statute. Under Illinois law, motor vehicle owners have the right to cancel service contracts at any time. 215 ILCS 152/35(a). Illinois law further requires a vehicle owner who cancels a service contract to receive "a pro rata refund of the service contract for the unexpired term of the service contract." *Id.* 152/35(a)(2). Presumably to ensure these refunds are paid, Illinois law also requires a service contract provider to be "insured" and provides that "the insurer will pay to, or on behalf of, the service contract provider all sums that the service contract provider is legally obligated to pay." *Id.* 152/15(1)(A)–(D).

According to PayLink, Protect My Car had the vehicle owners sign over to Protect My Car any refund rights they had regarding vehicle service contracts. Protect My Car then assigned these rights to PayLink via a clause in their agreement in which Protect My Car assigned PayLink all rights to its accounts if it failed to fully pay for PayLink's financing services. And because Virginia Surety is Protect My Car's insurer, PayLink alleges, Virginia Surety is on the hook for paying these refunds.

As indicated earlier, Virginia Surety is alleged to have refused to pay PMC Casualty the withheld amounts based on potential liabilities stemming from the PayLink lawsuit. PMC Casualty did not believe this was a proper reason under the reinsurance agreement to withhold the funds and thus filed the present lawsuit against Virginia Surety for breach of contract. Virginia Surety moved to dismiss the complaint, arguing that several provisions of the reinsurance agreement granted it the right to withhold the

5

funds.

Virginia Surety advanced five arguments for why the complaint should be dismissed: (1) it may reimburse itself for PMC Casualty's "share of premiums refunded pursuant to the provisions of the Reinsured Policies on account of cancellations of those Reinsured Policies" under section A-11(e)(1); (2) it may reimburse itself for PMC Casualty's "share of surrenders" and benefits or losses paid by Virginia Surety "pursuant to the terms and provisions of the Reinsured Policies" under section A-11(e)(2); (3) the withheld funds fall under section A-11(e)(4), which allows Virginia Surety "to pay any other amounts [Virginia Surety] claims are due under this [a]greement"; (4) PMC Casualty has not plausibly alleged any right to the Open Claims amount; and (5) Virginia Surety lacks any obligation to pay PMC Casualty any amounts under the reinsurance agreement because PMC Casualty lacks a valid Delaware certificate of authority.

The parties spent most of their motion to dismiss briefing debating the third argument—whether the withheld funds could be considered payment "due" to Virginia Surety under the reinsurance agreement pursuant to section A-11(e)(4). As discussed above, whether reserves are due to either party of the reinsurance agreement is determined by whether the account between PMC Casualty and Virginia Surety contains net positive or negative reserves. Virginia Surety argued that the account was at a net negative—and thus that Virginia Surety was owed the funds it was withholding—because the possible liability it faced from the PayLink action was deductible from the calculation of the account pursuant to section A-10(a)(5), which instructs "any other amount relevant to the Agreement" to be deducted from the

6

account's calculation.  PMC Casualty's Compl., Ex. 1 at 6.

In its motion to dismiss ruling, the Court concluded that the dispute "largely boil[ed] down to a disagreement" over the meaning of section A-10(a)(5), specifically whether that section allowed Virginia Surety to deduct its possible liability to PayLink from the account calculation.  Mem. Opinion & Ord. at 4, Dkt. No. 58.  The Court concluded that "[t]he contractual term 'amount(s) relevant to the agreement'" in section A-10(a)(5) was "arguably facially ambiguous," was "not defined in the reinsurance agreement," and "[i]ts interpretation at least arguably may entail consideration of extrinsic evidence and thus may involve questions of fact." *Id.* at 4–5.  On that basis, the Court concluded that the complaint should not be dismissed.  The Court also briefly touched on Virginia Surety's fifth argument—that PMC Casualty lacked a valid certificate of authority from the state of Delaware—and found that it "lack[ed] merit, at least on the present record." *Id.* at 5.  The Court did not address the three other arguments Virginia Surety advanced.

Virginia Surety filed the present motion for reconsideration of this Court's ruling.  It does not ask the Court to revisit its conclusions that the relevant term in section A-10(a)(5) is ambiguous or that PMC Casualty has plausibly alleged a valid certificate of authority.  Instead, Virginia Surety asks the Court to consider its three other arguments for withholding the funds that the Court did not address:  (1) Virginia Surety can reimburse itself for PMC Casualty's "share of premiums refunded pursuant to the provisions of the Reinsured Policies on account of cancellations of those Reinsured Policies" under section A-11(e)(1); (2) Virginia Surety can reimburse itself for PMC Casualty's "share of surrenders" and benefits or losses paid by Virginia Surety

7

"pursuant to the terms and provisions of the Reinsured Policies" under section A-11(e)(2); and (3) PMC Casualty has not plausibly alleged any right to the Open Claims amount.

## Discussion

There is no question that Virginia Surety's motion for reconsideration is appropriate here, because the Court did not address independent arguments it made for dismissal of PMC Casualty's complaint. And this is not a situation where one can say that the arguments, though not expressly referenced, were addressed implicitly in the Court's ruling. The Court just plain did not address them and therefore proceeds to do so now.

To survive a motion to dismiss, a complaint must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell. Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). For a claim to have "facial plausibility," a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that defendant is liable for the misconduct alleged." *McCauley v. City of Chicago*, 671 F.3d 611, 615 (7th Cir. 2011) (quoting *Iqbal*, 556 U.S. at 678). The Court views the complaint in "the light most favorable to the plaintiff, taking as true all well-pleaded factual allegations and making all possible inferences from the allegations in the plaintiff's favor." *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011).

**A.     Cancellation Refunds amount**

Virginia Surety first contends that sections A-11(e)(1) and (2) of the reinsurance agreement unambiguously allow it to withhold the Cancellation Refunds amount. The parties do not dispute that Illinois law governs the construction of the reinsurance

8

agreement at issue. *Cf. Bourke v. Dun & Bradstreet Corp.*, 159 F.3d 1032, 1036 (7th Cir. 1998) (noting that a federal court applies the "state substantive law" of "contract interpretation" when it asserts diversity jurisdiction over the parties). "Under Illinois law, the interpretation of an unambiguous contract is a question of law . . . ." *Echo, Inc. v. Whitson Co., Inc.*, 121 F.3d 1099, 1104 (7th Cir. 1997). "If the contract is unambiguous, therefore, a breach of contract claim is susceptible to dismissal for failure to state a claim." *Id.* Ambiguities within the contract, however, "create a question of fact" that cannot be resolved on a motion to dismiss. *Id.*

"A contract is ambiguous if its terms are indefinite or have a double meaning." *Lewitton v. ITA Software, Inc.*, 585 F.3d 377, 379 (7th Cir. 2009). "It is well established" that a contract is not ambiguous "simply because the parties offer different interpretations of its language." *Curia v. Nelson*, 587 F.3d 824, 829 (7th Cir. 2009). Rather, "[t]he question of contract ambiguity turns largely on whether the contract language is 'reasonably susceptible to more than one meaning.'" *Id.* (quoting *Susmano v. Associated Internists of Chi., Ltd.*, 97 Ill. App. 3d 215, 219, 422 N.E.2d 879, 882 (1981)).

As discussed above, sections A-11(e)(1) and (2) of the reinsurance agreement grant Virginia Surety some authority to withhold funds. Section A-11(e)(1) allows Virginia Surety to withhold funds "to reimburse [it] for [PMC Casualty's] share of premiums refunded pursuant to the provisions of the Reinsured Policies on account of cancellations of those Reinsured Policies." PMC Casualty's Compl., Ex. 1 at 8. Section A-11(e)(2) allows Virginia Surety to withhold funds "to reimburse [it] for [PMC Casualty's] share of surrenders and benefits or losses paid by [Virginia Surety] pursuant

to the terms and provisions of the Reinsured Policies." *Id.* In simpler terms, Virginia Surety may withhold funds to reimburse itself for payments it had to shell out based on the "Reinsured Policies," either because those policies were cancelled and refunds had to be paid (section A-11(e)(1)) or because some claim was made under those policies that had to be paid out (section A-11(e)(2)).

Virginia Surety and PMC Casualty posit two different interpretations for what "Reinsured Policies" refers to in these provisions. According to Virginia Surety, the "Reinsured Policies" are "Designated Contracts," which the reinsurance agreement defines as "any Service Contract . . . covered by an Insurance Policy." *Id.* at 3. In other words, Virginia Surety believes the Reinsured Policies are the underlying vehicle service contracts that Protect My Car sold to motor vehicle owners which Virginia Surety insured. Because those contracts were cancelled and PayLink is demanding refunds, Virginia Surety contends that it can withhold the Cancellation Refunds amount pursuant to these provisions.

According to PMC Casualty, however, the "Reinsured Policies" are the insurance policies that Virginia Surety sold to Protect My Car—i.e., the CLIPs. Under this interpretation, Virginia Surety cannot withhold funds under these provisions, as no CLIPs have been cancelled and Virginia Surety has not cited any losses that it has had to pay pursuant to the terms and provisions of the CLIPs.

On its face, the phrase "Reinsured Policies" seems reasonably susceptible to both interpretations. Yet Virginia Surety contends that its interpretation of "Reinsured Policies" must be right based on the phrase's in-agreement definition. Virginia Surety is correct that under Illinois law, a contract's definitions "supersede" any plain meaning of

10

the term used. *See Straits Fin. LLC v. Ten Sleep Cattle Co.*, 900 F.3d 359, 371 (7th Cir. 2018). But the reinsurance agreement's definition of "Reinsured Policies" is far from enlightening. The agreement states that a "'Reinsured Policy' means any Insurance Policy or Designated Contract or either of them, as the context may require." PMC Casualty's Compl., Ex. 1 at 4. So "Reinsured Policies" in sections A-11(e)(1) and (2) could refer to "Designated Contracts"—i.e., the underlying vehicle service contracts—as Virginia Surety suggests. But it could also refer to the "Insurance Policies" between Virginia Surety and Protect My Car—the CLIPs. Or it could refer to both. The in-agreement definition of "Reinsured Policies" thus does not help much in resolving these sections' ambiguity.

Virginia Surety remains undeterred by this apparent ambiguity built into the definition of "Reinsured Policies." It latches on to the last part of the definition, "as the context may require," and argues that the context of these provisions indicates they are referring to the vehicle service contracts and not to the insurance policies on those contracts (the CLIPs).

First, Virginia Surety contends that the term "share" in these provisions indicates that these provisions refer to the vehicle service contracts. According to Virginia Surety, it is more "intuitive to speak of PMC Casualty's 'share' of the thousands of Designated Contracts cancelled or surrendered by consumers" than it is "to speak of PMC Casualty's 'share' of cancelled or surrendered CLIPs, only two of which were issued." Virginia Surety's Mem. in Support of Mot. for Reconsideration at 6. But Virginia Surety cites no definition of "share," let alone one that supports its contention that "share" fits better when referring to thousands of contracts as opposed to two.

11

When a term is left undefined in a contract, as the term "share" is here, Illinois law requires it to be given its "plain, ordinary, and popular meaning." *Page v. Alliant Credit Union*, 52 F.4th 340, 346 (7th Cir. 2022) (quoting *Sproull v. State Farm & Fire Cas. Co.*, 2021 IL 126446, ¶ 19, 184 N.E.3d 203, 209)). The ordinary meaning of the noun "share" is "a portion belonging to, due to, or contributed by an individual or group." *Share*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/share. It is reasonable to describe PMC Casualty as having a "share" in the premiums refunded or losses paid, in that it must "contribute" "a portion" of those premiums or losses to Virginia Surety under the reinsurance agreement. But nothing in the term "share," at least how it is ordinarily understood, makes it more natural for it to refer to the agreed contribution of funds towards thousands of contract payments as opposed to just two.

Second, Virginia Surety contends that the reference to "refunds" in section A-11(e)(1) indicates that the term "Reinsured Policies" refers to the vehicle service contracts, as it is those contracts that might require refunds if cancelled. PMC Casualty disagrees, contending that the use of the insurance-specific term "premium" in this provision indicates that the possible refunds being contemplated are those that might have to be paid upon cancellation of the insurance-policy CLIPs themselves. Both arguments seem plausible. The Court thus finds that the context of these provisions, at least on the current record, does not require "Reinsured Policies" to refer to the vehicle service contracts.

Because the term "Reinsured Policies" is defined in the reinsurance agreement as possibly referring to the vehicle service contracts, or to the CLIPs, or to both, and because there does not appear to be any "context" that requires Virginia Surety's

interpretation, section A-11(e)(1) and (2) are ambiguous. This ambiguity creates a question of fact that cannot be resolved on a motion to dismiss. The Court therefore denies Virginia Surety's motion to dismiss PMC Casualty's breach of contract claim involving the Cancellation Refunds amount.

### 2. Open Claims amount

Next, Virginia Surety contends that PMC Casualty has not plausibly alleged it is owed the Open Claims amount under the reinsurance agreement. Virginia Surety emphasizes that PMC Casualty's only alleged basis for being owed the Open Claims amount are the reports issued by Virginia Surety concerning the reserves in the account. Specifically, PMC Casualty alleges that "the report to PMC Casualty for Q4 2023 and the report to PMC Casualty dated 'as of' January 31, 2024" reflect acknowledgment by Virginia Surety that the Open Claims amount is owed to PMC Casualty. PMC Casualty's Compl. ¶ 44. The Court may properly consider these reports, which both parties have attached as exhibits, when ruling on Virginia Surety's motion to dismiss, as they "are critical to the complaint and referred to in it." *Reed*, 906 F.3d at 548.

The Court concludes that PMC Casualty has plausibly alleged its breach of contract claim for the Open Claims amount. The Q4 2023 report states that $1,889,541—the amount identified as the Open Claims amount—reflects "claims due PMC [*sic*]." Baird Decl., Ex. 1 at 1. Virginia Surety contends that PMC Casualty misinterprets this report, as the later January 31, 2024 report qualifies the same amount with a note that states "[t]hese claim submissions were for contracts written in states in which a CLIP is not required and for which no payment was received." Virginia Surety's

13

Mem. in Supp. of Mot. to Dismiss, Ex. A at 1.  Because the reinsurance agreement requires Virginia Surety to compensate PMC Casualty only for reserves obtained via vehicle service contracts insured by CLIPs, Virginia Surety argues that the amount reflected as the Open Claims amount in these reports is not owed to PMC Casualty at all.

Although a court may consider attached documents critical to the complaint, that does not mean that it may resolve factual disputes on a motion to dismiss.  The Q4 2023 report indicates, without qualification, that the Open Claims amount is owed to PMC Casualty.  But the later January 31, 2024 report contradicts the prior report by adding a qualification that states this amount is not actually owed to PMC Casualty under the reinsurance agreement.  The Court cannot determine on a motion to dismiss which report is more persuasive; that would require resolving a factual dispute.  PMC Casualty's breach of contract claim is plausible based on the alleged admission in the Q4 2023 report, and it remains plausible even in the face of a conflicting later report.

Finally, Virginia Surety contends that PMC Casualty puts too much weight into the reports' alleged admissions.  Virginia Surety emphasizes that, under the reinsurance agreement, it only owes any "net" positive amounts created by the underlying contracts, not any other amounts that the reports reflect.  The Open Claims amount, according to Virginia Surety, is just an above-the-line factor that impacts what Virginia Surety might owe PMC Casualty but that does not reflect any actual net payments owed.

Even if the Court accepts that the Open Claims amount solely reflects an above-the-line factor that goes into calculating a net result, and not a net result itself, an acknowledgment that Virginia Surety maintains a large sum plausibly indicates that it

owes a positive net amount to PMC Casualty under the reinsurance agreement. Virginia Surety disagrees, noting that the January 31, 2024 report includes a large "premium" sum owed from PMC Casualty to Virginia Surety that would offset the Open Claims amount. PMC Casualty challenges the validity of this offset, however, as no amount of that large "premium" offset—which apparently amounts to $4,512,641—was present in the prior Q4 2023 report issued only two months prior. With this discrepancy in mind, a report stating that over $1.8 million is due to PMC Casualty, even if the report just reflects an above-the-line calculation, supports a plausible breach of contract claim for the Open Claims amount.

## Conclusion

For the reasons stated above, the Court grants Virginia Surety's motion for reconsideration [dkt. no. 67], but denies its motion to dismiss PMC Casualty's complaint [dkt. no. 14].

Date: June 16, 2025

_____
MATTHEW F. KENNELLY
United States District Judge