**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **PMC CASUALTY CORP.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 24 C 7795** |
| | ) | |
| **VIRGINIA SURETY CO., INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

MATTHEW F. KENNELLY, District Judge:

PayLink Payment Plans, LLC financed vehicle service contracts sold to motor vehicle owners by Protect My Car, LLC and its affiliates. Thousands of motor vehicle owners cancelled these contracts. After Protect My Car failed to repay PayLink for its financing, PayLink sued both Protect My Car and its insurer—Virginia Surety Co., Inc.—in separate state-court lawsuits.

Separately, Virginia Surety entered into an agreement with PMC Casualty Corp. to insure its own insurance obligations to Protect My Car—i.e., a reinsurance agreement. As relevant to this case, Virginia Surety agreed to pay the positive net reserves generated via its arrangement to insure the underlying service contracts to PMC Casualty Corp. Virginia Surety, however, allegedly refused to pay certain net reserves, citing its potential liability to PayLink.

PMC Casualty sued Virginia Surety in the Middle District of Florida for breach of the reinsurance agreement. The case was later transferred to the Northern District of Illinois, where it was reassigned to the undersigned judge.

PayLink has moved to intervene into this litigation as a defendant, proposing to assert state-law crossclaims and counterclaims against both Virginia Surety and PMC Casualty. For the reasons stated below, the Court denies PayLink's motion to intervene.

## Background

Protect My Car, LLC and Protect My Car Admin Services, Inc. (collectively "Protect My Car") sold vehicle service contracts—a form of extended warranties—to owners of motor vehicles. A motor vehicle owner could choose to pay for this service in one of two ways: in full upfront, or in monthly installments through a finance agreement. PayLink Payment Plans, LLC financed the vehicle owners' installment contracts. It agreed to advance Protect My Car a percentage of the sales price that it charged the vehicle owners. In exchange, Protect My Car would pay PayLink the installment payments due from vehicle owners until PayLink collected the amount it advanced, plus a fee.

Under Illinois law, motor vehicle owners have the right to cancel these service contracts at any time. 215 ILCS 152/35(a). Illinois law further entitles a vehicle owner who cancels a service contract to "a pro rata refund of the service contract for the unexpired term of the service contract." *Id.* 152/35(a)(2). Presumably to ensure these refunds are paid, Illinois law also requires a service contract provider to be "insured" and provides that "the insurer will pay to, or on behalf of, the service contract provider all sums that the service contract provider is legally obligated to pay." *Id.* 152/15(1)(A)–(D).

Protect My Car obtained the requisite liability insurance—called contractual

liability insurance policies (CLIPs)—from Virginia Surety to insure its obligations under the service contracts.  Virginia Surety then obtained insurance from PMC Casualty to protect it against the risks it assumed under the CLIPs.

The relationship between PMC Casualty and Virginia Surety is governed by a written contract called a reinsurance agreement.  Under the agreement, Virginia Surety ceded, and PMC Casualty reinsured, 100% of the risk of any payments that might have to be made under the vehicle service contracts covered by the CLIPs.  In exchange, PMC Casualty receives any net positive reserves created by the service contracts.

The agreement required PMC Casualty to maintain a trust account or a letter of credit to secure its reinsurance obligations to Virginia Surety.  PMC Casualty and Virginia Surety agreed that Virginia Surety could withdraw assets from the trust account only for four enumerated purposes:  (1) to reimburse Virginia Surety for PMC Casualty's share of premiums refunded "pursuant to the provisions of the Reinsured Policies on account of cancellations of those Reinsured Policies," (2) to reimburse Virginia Surety for PMC Casualty's share of "surrenders" and benefits or losses paid by Virginia Surety "pursuant to the terms and provisions of the Reinsured Policies," (3) to fund an account to cover reserves for claims and losses incurred; and (4) "to pay any other amounts [Virginia Surety] claims are due under this agreement."  PMC Casualty's Compl., Ex. 1 § A-11(e).

The agreement also sets out a method for calculating the account between PMC Casualty and Virginia Surety to determine ownership of any net reserves.  If the amount calculated results in a net positive result, the net is due to PMC Casualty from Virginia Surety.  But if the net is negative, the net is due to Virginia Surety from PMC Casualty.

In April 2023, PMC Casualty and Virginia Surety agreed to amend the reinsurance agreement. The amendment transferred the funds previously held in PMC Casualty's trust account to a Funds Withheld Account to be held by Virginia Surety. The amendment did not, however, change the limitations upon Virginia Surety for withdrawing assets from the account.

One last relevant requirement of the reinsurance agreement is that it required Virginia Surety to provide quarterly reports concerning the reserves in the account. According to PMC Casualty, two reports issued by Virginia Surety—a "Q4 2023" report and an "'as of' January 31, 2024" report—acknowledged reserves due to PMC Casualty. PMC Casualty's Compl. ¶¶ 29–30. These reports indicated that over $18 million of "cancellations" were due to PMC Casualty. *Id.*

## A.    State litigation

According to PayLink, roughly 30,000 of the vehicle service contracts it financed were cancelled before it was able to recoup its advanced payments. PayLink thus filed suit against Protect My Car in the Circuit Court of Cook County, Illinois in September 2023, alleging breach of contract. Yet it appears that Protect My Car does not have the ability to satisfy any judgment. So PayLink initiated a suit against Virginia Surety— Protect My Car's insurer—in November 2023, also in the Circuit Court of Cook County.

Although PayLink lacks a direct contract with Virginia Surety, it alleged in state court that it is owed the refund amounts mandated by statute that Virginia Surety allegedly insured as the insurer of Protect My Car. According to PayLink, Protect My Car had the vehicle owners sign over any refund rights to Protect My Car as part of their vehicle service contracts. Protect My Car then assigned these rights to PayLink via a

4

clause in their agreement in which Protect My Car assigned PayLink all rights to its accounts if it failed to repay PayLink for its financing services.  PayLink's Mem. in Support of its Mot. to Intervene, Ex. A at Ex. 7 ¶¶ 54–55.  Virginia Surety moved in state court to dismiss PayLink's complaint.

On January 12, 2024, PMC Casualty successfully moved to intervene in PayLink's state-court action against Virginia Surety.  PMC Casualty argued that "Virginia Surety owes certain obligations to PMC Casualty in connection with the reinsurance of the CLIPs, including the payment of Cancellation Refund Amounts under the CLIPs."  *Id.*, Ex. G. ¶ 17.  Based on these obligations, PMC Casualty contended its intervention was necessary as its "rights under the Reinsurance Agreement" would be "directly and substantially impacted and prejudiced by PayLink's Complaint."  *Id.* ¶ 21.  Once allowed to intervene, PMC Casualty filed a complaint for declaratory judgment, requesting an order that "PayLink is owed no duties, obligations, remedies, or amounts in connection with the Reinsurance Agreement."  *Id.*, Ex. A at Ex.1 ¶ 91(A)).

On December 10, 2024, Judge Anthony Swanagan—the presiding judge in this state-court suit—held a hearing to discuss the issues presented.  In this hearing, Judge Swanagan notified the parties that he was "going to issue an order" which would hold the following:  "I'm going to grant Virginia Surety's motion to dismiss, and then I'm going to grant [PMC Casualty's] motion for declaratory judgment saying that PayLink doesn't have any rights versus Virginia Surety."  Virginia Surety's Resp., Ex. 1 at 4–5.

**B.    Federal litigation**

As the state-court proceedings continued, PMC Casualty filed the instant lawsuit against Virginia Surety in the Middle District of Florida on June 7, 2024.  PMC Casualty

contended that Virginia Surety was breaching their reinsurance agreement by withholding the cancellation funds previously reported.  Virginia Surety moved to dismiss the complaint, arguing (among other things) that the PayLink action imposed potential liabilities that justified withholding payment under the reinsurance agreement.

Virginia Surety also moved for transfer.  Judge Thomas Barber granted this motion in August 2024 and ordered the case to be transferred to the Northern District of Illinois.  The case was then assigned to the undersigned judge.

Despite both PMC Casualty and Virginia Surety litigating their interests in the cancellation refund amount in state court, neither mentioned this federal litigation to PayLink.  It only learned of this case on November 13, 2024, when one of its attorneys researching prior litigation against PMC Casualty stumbled across it.  A joint motion for stay, filed in the present case on December 27, 2024 by PMC Casualty and Virginia Surety, indicated that PayLink was intending to move to intervene in this case.  The motion further stated that PayLink was refraining from filing a motion to intervene until the Court ruled on Virginia Surety's motion to dismiss and during any stay granted for settlement purposes.

On December 30, 2024, the Court denied Virginia Surety's motion to dismiss.  In that same order, the Court granted PMC Casualty's and Virginia Surety's motion to stay, staying the case through February 3, 2025.

February 3 came and went without any settlements.  PayLink thus filed the instant motion to intervene as a defendant on February 25, 2025.  It has attached a proposed answer, affirmative defenses, and counterclaims and crossclaims.  Specifically, PayLink seeks to assert claims that PMC Casualty committed fraudulent

transfers in violation of Illinois law, that Virginia Surety committed breach of contract by failing to provide PayLink refunds for cancelled service contracts, and that both have unjustly enriched themselves. PayLink also requests an equitable accounting from both PMC Casualty and Virginia Surety. These claims mirror the claims PayLink is making in state court.

PayLink makes clear in its proposed answer and in its briefs, however, that it does not actually want to litigate in this Court. Instead, PayLink has expressly averred that if this Court grants its motion to intervene, it will "move to dismiss this case on the grounds that it is an indispensable party whose mandatory presence destroys diversity, and/or stay this case under the *Colorado River* abstention doctrine." PayLink's Mem. in Support of its Mot. to Intervene at 2. Still, PayLink also notes that if its motions to dismiss or stay this action are denied, it will litigate its counterclaims and crossclaims in this forum.

## Discussion

### A.    Subject-matter jurisdiction

"Because federal courts possess limited jurisdiction, and 'jurisdiction is power to declare the law,' the first step in any federal lawsuit is ensuring the district court possesses authority to adjudicate the dispute—in short, that it has jurisdiction over the subject matter." *Boim v. Am. Muslims for Palestine*, 9 F.4th 545, 550 (7th Cir. 2021) (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998)). Congress has "granted federal courts jurisdiction over two general types of cases." *Home Depot U.S.A., Inc. v. Jackson*, 587 U.S. 435, 437–38 (2019). First, federal courts can adjudicate "cases that 'arise under' federal law" pursuant to their "federal-question

7

jurisdiction," 28 U.S.C. § 1331. *Id.* Second, federal courts can adjudicate "cases in which the amount in controversy exceeds $75,000 and there is diversity of citizenship among the parties" under their "diversity jurisdiction," 28 U.S.C. § 1332(a). *Id.*

It is undisputed that this Court had jurisdiction over the original case between PMC Casualty and Virginia Surety. Though PMC Casualty did not assert any claim under federal law, the Court had diversity jurisdiction, as the amount involved in the alleged contractual breach was over $18 million, and the parties were diverse: PMC Casualty is incorporated in Delaware and has its principal place of business in Florida, and Virginia Surety is incorporated and has its principal place of business in Illinois. *Cf. West v. Louisville Gas & Elec. Co.*, 951 F.3d 827, 830 (7th Cir. 2020) (noting that "each corporation has two state citizenships (incorporation and principal place of business)").

Before the Court can consider PayLink's motion to intervene, however, it must ensure it has jurisdiction over PayLink's claims in intervention as well. *See TIG Ins. Co. v. Reliable Rsch. Co.*, 334 F.3d 630, 633 (7th Cir. 2003) (considering first the "fundamental" question of whether "the district court could properly assert diversity jurisdiction" over a prospective intervenor's claims). It is not enough for PayLink to argue it satisfies the requirements for intervention under Federal Rule of Civil Procedure 24. The Federal Rules of Civil Procedure expressly do not, in themselves, "extend . . . the jurisdiction of the United States district courts." Fed. R. Civ. P. 82.

PayLink cannot rely on diversity jurisdiction either. It is diverse with *neither* party in this dispute. PayLink is a limited liability company, so the Court looks to the citizenship of PayLink's members to determine its citizenship for diversity jurisdiction purposes. *See Thomas v. Guardsmark, LLC*, 487 F.3d 531, 534 (7th Cir. 2007). And if

8

its members are LLCs, the Court must trace citizenship all the way down. *See West*, 951 F.3d at 830. PayLink's sole member is another LLC, OP Group Holdings, whose sole member is yet another LLC, Olive Ventures Holdings, which has the member PayLink Holdings Inc.—a corporation that is incorporated in Delaware and has its principal place of business in Illinois. This means PayLink is not diverse with either PMC Casualty (a Delaware corporation) or with Virginia Surety (an Illinois corporation).

Nor can PayLink argue this Court has federal-question jurisdiction over its claims. All of the claims PayLink intends to raise are based in state law, meaning none of the claims advanced in intervention arise under federal law.

PayLink's sole possible jurisdictional refuge is the Court's supplemental jurisdiction. Congress has granted district courts supplemental jurisdiction over certain claims brought by intervenors even when they lack an independent jurisdictional basis:

> Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. *Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties*.

28 U.S.C. § 1367(a) (emphasis added). The parties do not dispute that PayLink's claims fall under supplemental jurisdiction as described by section 1367(a). PayLink's claims, in which it contends that Virginia Surety and PMC Casualty have impermissibly transferred and withheld refund payments, are without question a "part of the same case or controversy" as PMC Casualty's breach of contract claim against Virginia Surety. All of these claims "derive from a common nucleus of operative fact," in that they all seek refund amounts obtained due to the cancellation of vehicle service

contracts sold by Protect My Car, insured by Virginia Surety, and financed by PayLink.

*Cf. City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 164–65 (1997) (quoting *Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966)).

But subsection (b) of section 1367 limits supplemental jurisdiction in several respects when, as is the case here, the Court's original jurisdiction is solely based on section 1332 diversity jurisdiction:

> In any civil action of which the district courts have original jurisdiction founded solely on section 1332 of this title, the district courts shall not have supplemental jurisdiction under subsection (a) over claims by plaintiffs against persons made parties under Rule 14, 19, 20, or 24 of the Federal Rules of Civil Procedure, or over claims by persons proposed to be joined as plaintiffs under Rule 19 of such rules, or seeking to intervene as plaintiffs under Rule 24 of such rules, when exercising supplemental jurisdiction over such claims would be inconsistent with the jurisdictional requirements of section 1332.

28 U.S.C. § 1367(b). As relevant to this dispute, subsection (b) prevents an intervening plaintiff from "rely[ing] on supplemental jurisdiction to support its Rule 24 claim in intervention" when "the exercise of such jurisdiction would be inconsistent with the requirements of § 1332." *TIG Ins.*, 334 F.3d at 634.

One requirement of section 1332 diversity jurisdiction is complete diversity—all plaintiffs must be diverse in citizenship from all defendants for a district court to have diversity jurisdiction. *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 553 (2005) (citing *Strawbridge v. Curtiss*, 7 U.S. 267, 267–68 (1806)); *see also Aurora Loan Servs., Inc. v. Craddieth*, 442 F.3d 1018, 1025 (7th Cir. 2006) (noting the "evident purpose of section 1367(b) is to prevent an "evasion of the requirement of complete diversity of citizenship"). As noted above, PayLink is not diverse vis-à-vis either of the other parties. Yet the text of section 1367(b) bars jurisdiction over claims that fail to

meet section 1332's requirements only by those "seeking to intervene as *plaintiffs*."
28 U.S.C. § 1367(b) (emphasis added). As several courts have held, a federal court
may exercise supplemental jurisdiction over the claims of non-diverse *defendants* even
when its original jurisdiction is based on section 1332 diversity. *See, e.g.*, *Price v.
Wolford*, 608 F.3d 698, 703 (10th Cir. 2010) (noting that section 1367(b)'s provisions did
not apply "because [the intervenor] intervened as a defendant, not a plaintiff"); *Karsner
v. Lothian*, 532 F.3d 876, 884 (D.C. Cir. 2008) (noting that because the intervenor was
"not seeking to intervene as a plaintiff . . . section 1367(b) does not bar . . . intervention
as of right"); *Dev. Fin. Corp. v. Alpha Hous. & Health Care, Inc.*, 54 F.3d 156, 161 (3d
Cir. 1995) ("We conclude that § 1367(b) does not deprive the district court of
supplemental jurisdiction over a counterclaim or cross-claim raised by an intervening
defendant, even where the intervenor shares citizenship with an original party.").

     Virginia Surety is correct, however, that a court should not simply accept a party's
self-ascribed label as a "defendant" when considering its jurisdiction. Jurisdiction
"cannot be conferred upon the federal courts by the parties' own determination of who
are plaintiffs and who defendants." *Am. Motorists Ins. Co. v. Trane Co.*, 657 F.2d 146,
149 (7th Cir. 1981) (quoting *City of Indianapolis v. Chase Nat'l Bank*, 314 U.S. 63, 69
(1941)). When a district court's jurisdiction is originally based on diversity of citizenship,
the court should "ascertain whether the alignment of the parties as plaintiff and
defendant conforms with their true interests in litigation." *Id.* "Realignment is proper
when the court finds that no actual, substantial controversy exists between parties on
one side of the dispute and their named opponents," even if that realignment would
"destroy diversity and deprive the court of jurisdiction." *Id.*

The Seventh Circuit, however, has emphasized that only one actual and substantial point of controversy is required to align parties on opposite sides of a case. "Realignment is undoubtedly improper when the court finds that an actual, substantial controversy exists between a party on one side of the dispute and its named opponent." *Krueger v. Cartwright*, 996 F.2d 928, 932 n.5 (7th Cir. 1993). The focus is thus on "the points of substantial antagonism" between the alleged adversaries, "not agreement." *Wolf v. Kennelly*, 574 F.3d 406, 412 (7th Cir. 2009) (citation omitted).

PayLink is correct that it has an actual, substantial controversy with PMC Casualty—the plaintiff—that justifies its label as "defendant." PayLink's interest in getting the refund amounts from Virginia Surety is directly adverse to PMC Casualty's interest in getting Virginia Surety to stop withholding those amounts. In fact, PayLink is intervening in this litigation to prevent PMC Casualty from winning its breach of contract suit and getting the funds transferred to itself, as that would make it harder for PayLink to recover from Virginia Surety. Put another way, PMC Casualty's claim in this case— that Virginia Surety has breached its contract by withholding funds due to the potential liability it faces from PayLink—puts PMC Casualty substantially at odds with PayLink, which has an interest in prompt payment of those withheld funds from Virginia Surety.

Virginia Surety seems to recognize that PayLink has a substantial controversy with PMC Casualty. It concedes that "PayLink's interests are antagonistic to the interests of *all* of the existing parties." Virginia Surety's Resp. at 9. Yet Virginia Surety still asks the Court to realign PayLink anyway, contending that PayLink's "principal purpose" in intervening is to prosecute its claims against Virginia Surety and PMC Casualty, not to defend itself from liability. *Id.*

Some circuits conduct a searching analysis into what the "principal purpose" of litigation is when determining whether parties should be realigned. The Seventh Circuit does not. It has expressly declined to adopt the "principal purpose" test, in favor of requiring only an actual, substantial controversy between opposing parties. *See Fidelity & Deposit Co. of Md. v. City of Sheboygan Falls*, 713 F.2d 1261, 1267–68 (7th Cir. 1983) (noting that this circuit only "requires an 'actual, substantial conflict'" between the parties, "not that it be over the primary issue in the litigation"); *see also Wolf*, 574 F.3d at 413 (recognizing the Seventh Circuit's use of the "'actual and substantial conflict' test" "is a minority view among the circuits"). In other words, although some circuits will require realignment of the parties after considering "the principal purpose of the suit" and the "primary controlling matter in dispute," courts in the Seventh Circuit will not realign the parties if there "is 'any actual and substantial conflict' between the parties." *Wolf v. Kennelly*, 540 F. Supp. 2d 955, 961 (N.D. Ill. 2008), *aff'd*, 574 F.3d 406 (7th Cir. 2009) (citation omitted). Whatever the merits of the "principal purpose" test are, it is not the law of this circuit.

Nor is the fact that PayLink is not "defending" against any claim a reason to realign an intervening defendant as a plaintiff. It is true that there are courts, all in other circuits, that have used the lack of possible liability to justify realignment. *See, e.g.*, *Chesapeake La., L.P. v. Buffco Prod., Inc.*, 564 F. App'x 751, 756 (5th Cir. 2014). Yet the parties have not cited, and the Court is not aware of, any court in the Seventh Circuit that has done so. An extensive analysis to determine whether a party could be held "liable" in any given dispute appears antithetical to the "actual and substantial controversy" test the Seventh Circuit applies.

13

Finally, although the Court can exercise supplemental jurisdiction over PayLink's claims, Virginia Surety argues it should refrain from doing so. Supplemental jurisdiction "is in some measure discretionary." *Royal Canin U.S.A., Inc. v. Wullschleger*, 604 U.S. 22, 31 (2025). A district court "may decline to exercise supplemental jurisdiction" over a claim if: "(1) the claim raises a novel or complex issue of State law, (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction." 28 U.S.C. § 1367(c); *see also Wullschleger*, 604 U.S. at 31–32 & n.4. When deciding whether to exercise supplemental jurisdiction, a court should also "consider and weigh in each case . . . the values of judicial economy, convenience, fairness, and comity." *Int'l Coll. of Surgeons*, 522 U.S. at 173 (cleaned up).

Virginia Surety contends that the pendency of a state court proceeding is a "compelling reason" to decline jurisdiction. It is true that several courts in this district have found parallel state court proceedings to be a compelling reason to refrain from asserting supplemental jurisdiction. *See, e.g.*, *Singer v. Mass. Mut. Life Ins. Co.*, 335 F. Supp. 3d 1023, 1035 (N.D. Ill. 2018); *Rao v. Abbott Laby's*, No. 12 C 8014, 2013 WL 1768697, at *9 (N.D. Ill. Apr. 2013); *Am. Dev., Inc. v. Int'l Union of Operating Eng'rs*, No. 98 C 339, 1998 WL 246455, at *4 (N.D. Ill. Apr. 29, 1998).

But the unique factual circumstances of PayLink's intervention support exercising supplemental jurisdiction nonetheless. Although judicial economy usually is not served by having parallel state and federal proceedings, *see Am. Dev.*, 1998 WL 246455, at *4,

14

PayLink has emphasized that its primary purpose in intervening into this federal litigation is to argue these proceedings should be dismissed or stayed in light of the state court proceedings. Judicial economy thus potentially would be served by exercising jurisdiction over PayLink's claims, as PayLink's participation in this action could lead to dismissal or stay, preventing otherwise parallel proceedings between this Court and the state-court proceedings that already involve both Virginia Surety and PMC Casualty. A potential stay or dismissal resulting from PayLink's intervention would also serve comity, in that it would prevent this proceeding from possibly interfering with any ruling in the parallel state court proceedings.

Therefore, the Court has supplemental jurisdiction over PayLink's claims in intervention and chooses to exercise it.

## B.    *Rooker-Feldman* doctrine

PMC Casualty contends that a different jurisdictional bar prevents PayLink's intervention: the *Rooker-Feldman* doctrine. "The *Rooker-Feldman* doctrine recognizes that Congress has not 'authorized district courts to exercise appellate jurisdiction over state-court judgments.'" *Gillbank v. Wood Cnty. Dep't of Hum. Servs.*, 111 F.4th 754, 765 (7th Cir. 2024) (en banc) (quoting *Verizon Md., Inc. v. Public Serv. Comm'n of Md.*, 535 U.S. 635, 644 n.3 (2002)) (cleaned up). *Rooker-Feldman* requires district courts to "disclaim jurisdiction only in 'cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments.'" *Id.* at 766 (quoting *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005)). The Seventh Circuit has articulated this test into four elements that must be met for

15

*Rooker-Feldman* to "block[] federal jurisdiction":

> *First*, the federal [party] must have been a state-court loser.  *Second*, the state-court judgment must have become final before the federal proceedings began.  *Third*, the state-court judgment must have caused the alleged injury underlying the federal claim.  *Fourth*, the claim must invite the federal district court to review and reject the state-court judgment.

*Id.*

*Rooker-Feldman* does not block this Court's jurisdiction because the third element has not been met:  there is no state-court judgment that caused injury to PayLink.  It is not enough to claim, as PMC Casualty does, that PayLink is attempting to "raise the same claims" as it did in state court.  PMC Casualty's Resp. at 5.  The Seventh Circuit is clear that "*Rooker-Feldman* does not apply" when "the federal [party] was also a plaintiff in state court, lost in a case seeking relief for injuries inflicted by the state-court defendant, and wants to relitigate the dispute in federal court."  *Gillbank*, 111 F.4th at 767.  This is because the injury in this circumstance is not caused by the state-court judgment.  Rather, a state-court loser hoping to relitigate an issue in a federal forum is simply hoping for another court to address an injury that occurred *before* the state-court judgment.  "Doctrines of claim and issue preclusion will often apply to bar relitigation . . . , but there is no jurisdictional bar."  *Id.* at 766.

PMC Casualty's reference to past Seventh Circuit cases that have indicated *Rooker-Feldman* applies when claims "are inextricably intertwined with a state court judgment" is misplaced.  PMC Casualty's Resp. at 5.  The recent *en banc* Seventh Circuit decision in *Gillbank* recognized that this phrase is both confusing and unhelpful in analyzing a *Rooker-Feldman* issue.  *Gillbank*, 111 F.4th at 766 n.5 (noting the phrase seemingly requires courts "to ponder the imponderable by asking whether a claim is

intertwined, inextricably or extricably, with a state-court judgment" and that "[a]ll judges agree here that the 'inextricably intertwined' language is not useful in analyzing questions under *Rooker-Feldman*").

Because PayLink has not been injured by a state-court judgment, *Rooker-Feldman* does not bar this Court's jurisdiction.

## C.    Intervention as of right

Now that the Court is satisfied it has jurisdiction over PayLink's motion to intervene, the Court considers the merits of the motion.  Federal Rule of Civil Procedure Rule 24(a)(2) "requires the court to allow intervention if the would-be intervenor can prove:  (1) timely application; (2) an interest relating to the subject matter of the action; (3) potential impairment, as a practical matter, of that interest by the disposition of the action; and (4) lack of adequate representation of the interest by the existing parties to the action."  *Bost v. Ill. State Bd. of Elections*, 75 F.4th 682, 686 (7th Cir. 2023) (cleaned up).  "The proposed intervenor has the burden of establishing all four elements; the lack of even one requires the court deny the motion."  *Planned Parenthood of Wis., Inc. v. Kaul*, 942 F.3d 793, 797 (7th Cir. 2019).

The Court considers only whether PayLink has established "an interest relating to the subject matter of the action," as it is dispositive in this case.  To intervene as of right, an intervenor must have a "direct, significant and legally protectable interest in the subject at issue in the lawsuit."  *Bost*, 75 F.4th at 687.  The proposed intervenor must have more than "a mere 'betting' interest in the outcome of a case."  *Reich v. ABC/York-Estes Corp.*, 64 F.3d 316, 322 (7th Cir. 1995).  A proposed intervenor's interest must be more than "some outstanding monetary claim from one of the parties," making them

interested in the case solely to "ensure that the outcome of the case preserves as much of its claim as possible." *Id.*

PayLink does not have a legally protectable interest in the subject of the lawsuit, as its interest in Virginia Surety not having to transfer the refund amounts to PMC casualty is simply an interest in preserving its ability to collect on its own claim against Virginia Surety. PayLink is not a party to the Virginia Surety–PMC Casualty reinsurance agreement. And although the funds Virginia Surety is withholding from PMC Casualty are the same funds PayLink argues it is entitled to, money is fungible, and legally speaking, Virginia Surety can be held liable to both PayLink and PMC Casualty. PayLink's interest in getting paid promptly from Virginia Surety, although sufficient on these facts to allow for supplemental jurisdiction, is not a legally protectable interest justifying intervention as of right. *Cf. Flying J, Inc. v. Van Hollen*, 578 F.3d 569, 571 (7th Cir. 2009) (noting that an "interest" that allows for intervention as of right must be "more than the minimum Article III interest"). The fact that PayLink "might anticipate a benefit from a judgment in favor" of Virginia Surety, in that it will make it easier for Virginia Surety to satisfy any outstanding monetary obligation to PayLink, "does not entitle" PayLink to intervene in this suit. *See id.*

The Seventh Circuit's decision in *Meridian Homes Corp. v. Nicholas W. Prassas & Co.*, 683 F.2d 201 (7th Cir. 1982), is illustrative. The underlying lawsuit in *Meridian Homes* concerned the attempted dissolution of a joint venture agreement between the plaintiff and defendant, which would result in the judicial sale of part of the venture's property. *Id.* at 202–03. Two brothers who owned "an undivided one-half share" in the defendant's "rights and interests in several real estate developments, including the

18

property which [was] the subject of the joint venture," attempted to intervene as of right. *Id*. These potential intervenors had already "filed suit against [both parties] in state court requesting specific performance and other relief in relation" to the property subject to the joint venture. *Id*. at 203. Despite this, the Seventh Circuit concluded that the potential intervenors did not have a sufficient interest in the litigation to intervene as of right. *Id*. at 204. The court noted that the intervenors' interest was really just an "interest in the joint venture profits earned by the [defendant]" and that they would be "entitled" to those profits "regardless of whether the joint venture continues in existence or is dissolved." *Id*. Although the court recognized that "[h]ow the profits are generated, how the joint venture is managed, or whether the joint venture continues are matters which may indeed be of concern to the [potential intervenors] insofar as they might affect the available profits," these concerns could not be considered "matters in which the [potential intervenors] have a direct and substantial, and therefore legally protectable, interest." *Id*.

PayLink has an insufficient interest analogous to that of the potential intervenors did in *Meridian Homes*. Like *Meridian Homes*, it is undisputed that PayLink has some interest in this litigation, in the sense that the litigation may affect its ability to promptly recover funds from Virginia Surety. But PayLink's potential entitlement to recover from Virginia Surety is not affected by any result in this federal litigation. Whether Virginia Surety can, under its reinsurance contract with PMC Casualty, withhold certain funds does not, legally speaking, affect PayLink's right (if it has one) to payments from Virginia Surety, even if the funds at issue originated from the same cancelled service contracts.

In fact, PayLink's interest in this case is in some ways *less* significant than the

19

potential intervenors in *Meridian Homes*.  Because the potential intervenors in *Meridian Homes* had a right to profits, their desire to intervene into litigation that would produce certain profits was understandable; they were hoping to ensure maximization of the profits they were entitled to.  In this case, any determination by the Court concerning Virginia Surety's rights under its reinsurance agreement with PMC Casualty would not just be irrelevant to PayLink's alleged right to the refund payments, it would not even affect the amount of funds PayLink is entitled to recover from Virginia Surety.

Nor does PayLink's argument, made mostly in a footnote, that the refund amounts can be considered a "specific chattel" help establish an interest entitling it to intervene as a matter of right.  *See* PayLink's Reply at 8 n.9.  The case PayLink cites to support this point concerns the tort of conversion, which in Illinois requires the unauthorized control of "personal property."  *See Desmond & Ahern, Ltd. v. Scheffki*, No. 01 C 6098, 2001 WL 1646562, at *9 (N.D. Ill. Dec. 21, 2001).  PayLink has not asserted a claim for conversion, so this case has little if any applicability to this matter.  The fact that Illinois allows identifiable amounts of money to sometimes be considered a chattel for purposes of establishing the elements of conversion does not indicate that PayLink's non-conversion claims for refund amounts are a direct, significant, or legally protectable interest in the subject matter of this federal litigation.

PayLink disagrees, arguing that PMC Casualty's ability to intervene into PayLink's state-court dispute indicates that PayLink has an interest sufficient to intervene in federal court.  Yet a potential intervenor's ability to intervene in state court has little bearing on the requirements for federal intervention.  "The right to intervene 'is a purely procedural right and even in a diversity suit it is the Federal Rules of Civil

Procedure rather than state law that dictate the procedures, including who may intervene, to be followed.'" *Kaul*, 942 F.3d at 797 (citation omitted).  Although the Seventh Circuit has indicated a state's intervention procedures can "inform the Rule 24(a)(2) calculus," "it cannot displace the requirement that a would-be intervenor satisfy each of the rule's prerequisites."  *Id.* (quoting *Pub. Serv. Co. of N.H. v. Patch*, 136 F.3d 197, 208 (1st Cir. 1998)).

Illinois's intervention procedures are particularly unpersuasive when interpreting federal intervention procedures, as Illinois's rules for intervening as of right differ from the federal rules.  In particular, a "party petitioning for intervention as of right" in Illinois "need not have a direct interest in the pending suit."  *In re Bailey*, 2016 IL App (5th) 140586, ¶ 21, 58 N.E.3d 646, 653 (citing *People ex rel. Birkett v. City of Chicago*, 202 Ill. 2d 36, 57–58, 779 N.E.2d 875, 887–88 (2002)).  The fact that PMC Casualty was able to intervene in state court under this more lenient standard does not show that PayLink has an interest that is direct, significant, and legally protectable for federal intervention as of right.

Because PayLink's interest in this federal litigation simply involves increasing the odds that its separate claim against Virginia Surety will be paid promptly, PayLink has not shown a direct, significant, and legally protectable interest in the subject matter of this litigation.  It therefore cannot intervene as a matter of right.

D. **Permissive intervention**

In the alternative, PayLink requests this Court allow it to permissively intervene.  *See* Fed. R. Civ. P. 24(b)(1)(B).  Before a court may "exercise its discretionary power to grant intervention," it must ensure two threshold requirements are met.  *Sec. Ins. Co. of*

*Hartford v. Schipporeit, Inc.* 69 F.3d 1377, 1381 (7th Cir. 1995). Specifically, "[t]he proposed intervenor must demonstrate that there is (1) a common question of law or fact, and (2) independent jurisdiction." *Id.*

PayLink has not shown an independent basis for jurisdiction as required to allow for permissive intervention. Although the Court has found it has supplemental jurisdiction over PayLink's claims, supplemental jurisdiction is not an independent jurisdictional basis. *See Boim*, 9 F.4th at 551 ("A third source of jurisdiction—supplemental or ancillary jurisdiction—also plays a role. Once a court acquires an *independent basis* for subject matter jurisdiction over a case (often pursuant to § 1331 or § 1332), the court can entertain certain claims or incidental proceedings that would not, on their own, suffice for federal jurisdiction.") (emphasis added). And as discussed above, there is no other basis for jurisdiction over PayLink's claims.

Because PayLink has not demonstrated an independent basis for jurisdiction over its claims in intervention, it cannot permissively intervene.

## E. Indispensable party

Finally, PayLink contends that even if it cannot intervene, the entire federal suit should be dismissed for failure to join an indispensable party that would destroy jurisdiction—namely PayLink. Federal Rule of Civil Procedure 19 determines whether a party must be joined in litigation. The rule "sets up a two-step inquiry." *Thomas v. United States*, 189 F.3d 662, 667 (7th Cir. 1999). First, a court "must determine whether a party is one that should be joined if feasible,"—i.e., a "required" or "necessary" party. *Id.*; Fed. R. Civ. P. 19(a). Rule 19 defines a "required party" as follows:

22

> Required Party.  A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if:  (A) in that person's absence, the court cannot accord complete relief among existing parties; or (B) that person claims an interest relating to the subject matter of the action and is so situated that disposing of the action in the person's absence may:  (i) as a practical matter impair or impede the person's ability to protect the interest; or (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Fed. R. Civ. P. 19(a)(1).  "Only if the court determines that a party meets the criteria of Rule 19(a)(1)(A) and (B), but the party cannot be joined," will the court reach the second step:  determining "whether the litigation can proceed at all in the party's absence." *Askew v. Sheriff of Cook Cnty.*, 568 F.3d 632, 634–45 (7th Cir. 2009).

PayLink argues that it is a required party under Rule 19(a)(1)(B) because "disposition of this action in PayLink's absence may . . . impair or impede" its ability to protect its interest in the refund amount, or its absence will leave Virginia Surety "subject to . . . possible double-liability" from both PayLink and PMC Casualty. PayLink's Reply at 3, n.4 (quoting Fed. R. Civ. P. 19(a)(1)(B)) (cleaned up).  However, both of these contentions require PayLink to first show, under Rule 19(a)(1)(B), that it "claims an interest relating to the subject of the action."  Fed. R. Civ. P. 19(a)(1)(B).

PayLink's arguments for being a required party falter for the same reason PayLink cannot intervene as of right:  it has not shown a sufficient interest in the subject of this federal action.  The consensus in this circuit is that the type of "interest" required for intervention as of right under Rule 24 is the same for joinder under Rule 19—the interest must be "direct, significant, and legally protectable."  *See, e.g.*, *Carolina Cas. Ins. Co. v. Merge Healthcare Inc.*, No. 11 C 3844, 2011 WL 3921412, at *4 (N.D. Ill. Sep. 6, 2011) (quoting *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of*

*Eng'rs*, 101 F.3d 503, 506 (7th Cir. 2006)).  A finding that a party lacks a sufficient interest to intervene as of right necessarily means that the party also lacks the necessary interest to be a required party for joinder.  *See, e.g.*, *Taco Bell Corp. v. Cont'l Cas. Co.*, No. 01 C 438, 2003 WL 124454, at *8 (N.D. Ill. Jan. 13, 2003) ("[F]or the same reasons that [the proposed intervenor] failed the 'interest' and 'impairment' prongs of Rule 24(a)(2), so too it fails the 'interest' and 'impairment' prongs of Rule 19."); *Bell v. City of Milwaukee*, 536 F. Supp. 462, 471 (E.D. Wis. 1982), *rev'd in part on other grounds*, 746 F.2d 1205 (7th Cir. 1984) (noting that its finding that a proposed intervenor "did not have a legal interest relating to the transaction that is the subject matter of this suit" during its Rule 24(a) analysis "compels the conclusion that [the proposed intervenor] is not a person to be joined if feasible under Rule 19(a)").

As the Court has already found that PayLink lacks a direct, significant, and legally protectable interest to intervene as of right, the Court must also find that PayLink does not have a sufficient interest to be a required party under Rule 19.  With no other bases for participating in this federal litigation left, the Court denies PayLink's motion to intervene.  The Court therefore need not consider PMC Casualty's argument that PayLink's claims in intervention would also be barred by claim preclusion or the rule against claim splitting.

## Conclusion

For the reasons stated above, the Court denies PayLink's motion to intervene [dkt no. 75].

Date:  June 19, 2025

MATTHEW F. KENNELLY
United States District Judge

24